Robert A. FROST, Plaintiff,

v.

Kenneth GALLUP, Jr. and F/V MABEL
SUSAN, her engines, tackle, apparel,
etc., Defendants.

Civ. A. No. 4067.

United States District Court,
D. Rhode Island.

June 4, 1971.

Louis P. Sheinbaum, of Bingham, Englar, Jones & Houston, New York City, Richard M. Borod, of Edwards & Angell, Providence, R. I., for plaintiff.

Bardyl R. Tirana, of Amran, Hahn, Sundlun & Sandground, Bruce G. Sundlun, Washington, D. C., for defendants.

## OPINION

DAY, District Judge.

This civil action arises out of a collision between the F/V Mabel Susan and the auxiliary sloop Topu Wetu on September 19, 1966, between 4:30 A.M. and 5:00 A.M., in the Point Judith Harbor of Refuge in Rhode Island. As a result of said collision both vessels were damaged.

The plaintiff, the owner of said Topu Wetu, seeks herein to recover the damages allegedly sustained by him as a result of said collision. The defendant, Kenneth Gallup, Jr. by way of counterclaim seeks to recover for damages allegedly sustained by him as the owner of the F/V Mabel Susan.

At the conclusion of the trial on the merits, I reserved decision pending the filing by the parties of memoranda which have been considered by me.

The credible evidence and the reasonable inferences to be drawn from it establish the following facts. On September 14, 1966, the plaintiff chartered said Topu Wetu to one James Dow for a period of one (1) week for the purpose of pleasure cruising in New England waters. During the evening hours of September 18, 1966 the Topu Wetu was anchored off the shore of Block Island where Dow, his financee and two male friends had spent the day. At that time the wind was quite strong and after Dow had studied the provisions of the United States Coast Pilot, a publication prepared and issued by the United States Department of Commerce, they decided that the Point Judith Harbor of Refuge would provide a much better and safer place of anchorage for the Topu Wetu.

The Topu Wetu left Block Island shortly after midnight with Dow who had enjoyed considerable experience in sailing similar boats at her helm. About four (4) hours later the Topu Wetu entered said Point Judith Harbor of Refuge through the East Gap, so-called, the waterway between a breakwater on the east and the V-shaped breakwater located to the west of said harbor. Said East Gap is the primary passageway for vessels going to and from fishing grounds lying to the east of said harbor.

The Topu Wetu rounded the flashing breakwater light on the top of the easterly end of said V-shaped breakwater within fifty (50) yards thereof and thereafter sailed on a close reach toward the flashing red light on the westerly end of said breakwater. She also followed soon thereafter a course of 220° true as determined by her magnetic compass. Dow, after adopting said course, lowered her jib and the Topu Wetu continued on said course under her engine power into the prevailing wind toward the southwest and to a point south of an imaginary straight line that would be formed by connecting the open ends of said breakwater.

After dropping anchor within the anchorage area recommended by said United States Coast Pilot, Dow connected a 360° marine anchor light to the sloop's #2 battery. Said light was in a lantern so constructed as to show a clear, uniform and unbroken light visible all around the horizon at a distance of at least two miles as required by the provisions of 33 U.S.C. § 180(a). Dow then hung said lantern from the forestay of the Topu Wetu at a height of between six (6) and ten (10) feet above the deck. Said light was turned on at approximately 4:30 A.M. and was burning at its

full intensity. Dow then retired to his cabin on the sloop. Within a few minutes thereafter Dow heard what seemed to him to be the sound of a diesel engine, but due to the darkness was unable to determine its position or distance from the Topu Wetu. He promptly checked said anchor light and found it to be burning with full intensity and visibility. This observation was made by him approximately five (5) minutes before said collision and it is undisputed that said light was burning at its full intensity at the time of said collision.

Although the defendant Gallup claimed that said light was not visible until the Mabel Susan was within seventy-five (75) feet of the Topu Wetu, I am satisfied that he did not see said light at a greater distance from the Topu Wetu because he was at the helm of the Mabel Susan and was not observing what was ahead of her. Additionally, he conceded that one Ray Browning who had worked for him since 1964 and who was serving as a lookout so-called, was at all times stationed at the starboard door of the pilot-house of the Mabel Susan, at a point about thirty-five (35) feet from the bow of the Mabel Susan. Browning for some unexplained reason did not testify during said trial.

Although there was no moonlight and it was admittedly very dark, the Mabel Susan was using no lights either to locate buoys in said harbor or to observe the waters ahead of her. Similarly, prior to said collision, Gallup was not using the radar of the Mabel Susan and claimed that it was not useful for ranges of less than one-half (½) mile and that in any event it had ceased to be operative on September 18, 1966. Other evidence establishes that said radar was operating properly on September 20, 1966 without any repairs having been made thereto and that the distance between Galilee, from which the Mabel Susan had departed shortly before said collision, and the East Gap toward which she was proceeding was slightly less than two (2) miles.

After a careful consideration of all of the evidence and the reasonable inferences to be drawn from it, I am convinced that at the time of said collision the Topu Wetu was properly anchored within said V-shaped breakwater, and that her anchor light was burning brightly and had been burning brightly for at least five (5) minutes before she was struck by the Mabel Susan which was proceeding at a speed of seven (7) knots per hour until she was only seventy-five (75) feet away from said Topu Wetu.

When a moving vessel collides with an anchored vessel there is a presumption that the moving vessel is at fault. The Oregon, 158 U.S. 186, 15 S. Ct. 804, 39 L.Ed. 943 (1895); Petition of United States, 425 F.2d 991 (5 Cir. 1970); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Company, 377 F.2d 724 (5 Cir. 1964); Pacific Tow Boat Co. v. States Marine Corp. of Delaware, 276 F.2d 745 (9 Cir. 1960); Standard Dredging Corporation v. S/S Syra, 290 F.Supp. 260 (D.Md.1968).

In Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Company, supra, the Court of Appeals said at page 726 of 377 F.2d:

"The Court below did not err in finding Brown & Root negligent. Where a moving vessel collides with an anchored vessel or a fixed object, there is a presumption the moving vessel is at fault. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949 (1895); The Clarita, 90 U.S. (23 Wall.) 1, 13, 23 L.Ed. 146, 150 (1874); Patterson Oil Terminals, Inc. v. The Port Covington, 3 Cir. 1953, 205 F.2d 694, 696; The Victor, 5 Cir. 1946, 153 F.2d 200, 202, 203. The presumption suffices to make a prima facie case of negligence against the moving vessel * * * "

In my opinion the fact that Gallup did not observe said anchor light until the Mabel Susan was within seventy-five (75) feet of the Topu Wetu does not establish that it was not burning brightly prior thereto. He conceded that it was burning brightly when he first observed it and after said collision. As the Court said in Rosado v. Pilot

Boat No. 1, 304 F.Supp. 49, at pages 53–54 (D.P.R.1969):

"This conflict in the testimony must be resolved in favor of the plaintiffs. 'Affirmative testimony that lights were displayed is given greater weight than negative testimony that they were not.' Sun Oil Co. v. S.S. Georgel, 245 F.Supp. 537, 546 (S.D. N.Y.1965). A finding that a vessel had no lights or was obscure will not be made on mere conjecture. The Thingvalla, 48 F. 764 (2d Cir. 1891); The Richmond, 114 F. 208 (E.D.Va. 1902); The Hampton Roads, 1926 A. M.C. 1510."

■ Additionally, the Court finds that the defendant Gallup was negligent as a matter of law in failing to operate said Mabel Susan with a proper lookout as required by the provisions of 33 U.S. C.A. § 221. Although as hereinbefore recited, Browning, the alleged lookout, did not testify it is clear from Gallup's testimony that Browning was stationed at the doorway on the starboard side of the pilot house of the Mabel Susan which was approximately thirty-five (35) feet from her bow.

■ The law is well settled that a lookout is the "eyes of the ship" and should be stationed as far forward on the ship as is possible in order to see and hear other ships in the best possible manner. The Vedamore, 137 F. 844 (4 Cir. 1905); Harbor Towing Corporation v. Tug Reliance, 211 F.Supp. 896 (E.D. Va.1963); Osaka Shosen Kaisha, Ltd v. The Elene, 190 F.Supp. 201 (D.Md.1961) affirmed in part, reversed in part, on other grounds, 301 F.2d 59 (4 Cir. 1962), and that such standard is to be evaluated in the light of all the surrounding circumstances.

Ordinarily the proper position of a lookout will be at or near the bow of the vessel. Sun Oil Co. v. S.S. Georgel, 245 F.Supp. 537 (S.D.N.Y.1965) aff'd 369 F.2d 406 (2 Cir. 1966), but in any event it is well established that the pilot house of a vessel is not a proper location for a lookout. The Welsh, 276 F. 912 (2 Cir.

1921); Eastern Dredging Co. v. Winnisimmet Co., 162 F. 860 (1 Cir. 1908); The George W. Childs, 67 F. 269 (E.D. Pa.1895).

■ In my opinion failure of the defendant Gallup to maintain a proper lookout on the Mabel Susan was the sole cause of said collision. There was no credible evidence of any negligence on the part of Dow which contributed thereto. The plaintiff is clearly entitled to an award in his favor.

Plaintiff seeks to recover herein the cost of necessary repairs to the Topu Wetu which counsel for the parties have stipulated was $1,516.24. In addition he seeks recovery of the following amounts, viz: (1) the sum of $100 which he claims he is obligated to refund to Dow because his charter of the Topu Wetu was shortened by two (2) days as the result of said collision, (2) the sum of $510 which he claims to have lost because he was unable to consummate a proposed charter party with one William Walter Calvert which was to begin on September 24, 1966, and (3) the sum of $80 which represented out-of-pocket expenses he claims to have incurred in attending to the Topu Wetu and in making arrangements for repairs thereto.

■ Although said collision occurred on September 19, 1966, plaintiff conceded during the trial of this action that he had not yet repaid said sum of $100 to Dow. No copy of the charter party to Dow was introduced into evidence to show what amount, if any, he was required to refund to Dow if said charter party was terminated before its expiration date. Under the circumstances, I conclude that the plaintiff has not established by the required degree of proof this item of his alleged damages.

■ In support of his claim for said alleged loss of $510 the plaintiff introduced into evidence as an exhibit an unsigned draft of a proposed charter party between him and said William Walter Calvert. Apparently this document was prepared by an agent of the plaintiff, but no testimony was presented to estab-

lish that said agreement had been actually accepted by Calvert. Under the circumstances I find that the plaintiff has failed to establish by the required degree of proof that he had sustained said alleged loss of $510.

Similarly I find that the plaintiff has failed to establish by a fair preponderance of the evidence that he sustained out-of-pocket expenses in the amount of $80 in attending to the Topu Wetu and in arranging for necessary repairs to her as a result of said collision. Undoubtedly he sustained some such expenses for travel in arranging for said repairs but unfortunately he made no records thereof and his testimony as to such items was most general, consisting of approximations. Under the circumstances, I conclude that he has failed to establish his right to recover this item of his claim.

As hereinbefore recited, counsel for the parties have stipulated that the cost of the necessary repairs to the Topu Wetu was $1,516.24. The plaintiff testified that he paid for said repairs between October 7, 1966 and November 7, 1966, but could not recall the exact date when said payment was made. Under the circumstances I conclude that said payment was made on November 7, 1966. Plaintiff seeks also to recover interest on said sum of $1,516.24 from the date of its payment by him.

■ It is also well settled that the allowance of prejudgment interest in admiralty cases rests within the discretion of the trial court. Reiss Steamship Company v. United States Steel Corporation, 427 F.2d 1152 (6 Cir. 1970); Sinclair Refining Company v. S.S. Green Island, 426 F.2d 260 (5 Cir. 1970); National Airlines, Inc. v. Stiles, 268 F.2d 400 (5 Cir. 1959); O'Donnell Transport Co. v. City of New York, 215 F.2d 92 (2

Cir. 1954); Moore-McCormack Lines, Inc. v. Amirault, 202 F.2d 893 (1 Cir. 1953).

In Moore-McCormack Lines, Inc. v. Amirault, supra, the Court of Appeals said at page 898:

"But in collision cases the common statement is that, in the absence of special circumstances, interest on damages eventually awarded to the owner of the damaged vessel should be computed from the date of the collision or from the dates when payments for the necessary repairs were actually made (citations omitted) * * *"

■ Although the instant action was not commenced by the plaintiff until January 29, 1969, I do not think that fact alone in this case is sufficient to warrant a departure from the general rule in admiralty cases that interest on amounts expended for necessary repairs to a vessel will be allowed from the date when payment for such necessary repairs was made.

■ Plaintiff contends that such interest should be computed at the rate of eight (8) per centum per annum on any award made to him and in support of this contention relies upon the provisions of sec. 9–21–10[1] of R.I. General Laws 1956, as amended. In my opinion said statute is not properly applicable to this case. Canova v. Travelers Insurance Company, 406 F.2d 410 (5 Cir. 1969); Gardner v. The Calvert, 253 F.2d 395 (3 Cir. 1958); Moore-McCormack Lines, Inc. v. Amirault, supra; Samincorp v. S.S. Rivadeluna, 277 F. Supp. 943 (D.Del.1967); Virgin Islands Corporation v. Merwin Lighterage Co., Inc., 177 F.Supp. 810 (D.V.I.1959).

■ Considering all of the circumstances in this case I conclude that it is equitable and just that the defendant

---

1. Said section provides as follows:

"Interest in action for damages to the person or to property.—In causes of action and actions for damages to the person or to real and personal estate in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages, interest at the rate of eight per cent (8%) per annum thereon from the date of commencement of the action which shall be included in the judgment entered therein."

pay interest at the rate of six (6) per centum per annum on said sum of $1,-516.24 from November 7, 1966 to the date of this opinion. Said interest amounts to $416.45.

Judgment will be entered in favor of the plaintiff against the defendant Kenneth Gallup, Jr. in the sum of $1,932.69 and in the plaintiff's favor on the counterclaim of the defendant.

